IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FRED C. LAMPLEY,              *
                             *
     Plaintiff,              *      CIVIL ACTION NO. 13-00279-B
                             *
vs.                          *
                             *
CAROLYN W. COLVIN,           *
Commissioner of Social Security,*
                             *
     Defendant.              *

<u>ORDER</u>

Plaintiff Fred C. Lampley (hereinafter "Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.* On May 1, 2014, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 18). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

## I.  **Procedural History**

Plaintiff protectively filed an application for a period of disability, disability insurance benefits, and supplemental security income on September 23, 2009.  (Tr. 149-59).  Plaintiff alleged that he has been disabled since May 9, 2009, due to "left hip, heart condition, pinch[ed] nerve in back, [and] spurs [in] groin."  (Id. at 173).  Plaintiff's applications were denied and upon timely request, he was granted an administrative hearing before Administrative Law Judge Roger A. Nelson (hereinafter "ALJ") on February 24, 2011.  (Id. at 36). Plaintiff attended the hearing with his counsel and provided testimony related to his claims.  (Id. at 42).  A vocational expert ("VE") also appeared at the hearing and provided testimony. (Id. at 72).  On January 5, 2012, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled. (Id. at 31).  The Appeals Council denied Plaintiff's request for review on April 5, 2013.  (Id. at 1).  The parties waived oral argument (Doc. 17), and agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  **Issue on Appeal**

> **Whether the ALJ erred in not giving controlling weight to the opinions of Plaintiff's treating physician?**

## III. **Factual Background**

Plaintiff was born on April 10, 1963, and was forty-seven years of age at the time of his administrative hearing on February 24, 2011. (Tr. 156). Plaintiff testified that he went through the eighth grade in school[1] and last worked in 2008 performing apartment maintenance and remodeling. (Id. at 44, 204). Prior to 2008, Plaintiff worked as a truck driver, in general construction, and at Lowe's as a sales associate. (Id. at 46-47).

Plaintiff testified that he stopped working "[b]ecause of [his] hip." (Id. at 48). According to Plaintiff, his treating physician, Dr. Bose, recommended hip joint replacement surgery, but Plaintiff did not have health insurance or money to pay for it. (Id. at 53, 65). Plaintiff also testified that his treating physician Dr. Dulanto, is "trying to help [him]" and "wants [Plaintiff] to try to get on disability so [he] can get his hip replaced." (Id. at 54). Plaintiff's medications include Lortab (3 times a day for pain), Nitroglycerin (for his heart), Meclizine (for dizziness), Albuterol (for breathing), and Neurontin (for nerve pain). (Id. at 50-55, 59).

Plaintiff testified that he lives with his wife and that he

_____

[1] Plaintiff testified that he was in special education classes for one year because he was having trouble focusing. (Tr. 61). He dropped out of school in the eighth grade at the age of sixteen. (Id. at 60).

cannot take care of his personal needs because of hip pain. (Id. at 42, 57). According to Plaintiff, he can read and write "okay," and he can maintain a check book, read the newspaper, and drive. (Id. at 61-62). Plaintiff further indicated that he can only stand and sit for about thirty minutes and is able to walk about a block before becoming uncomfortable. (Id. at 55-56). Additionally, Plaintiff is able to wash dishes and do laundry; however, he cannot do yard work. (Id. at 57). Plaintiff testified that on a scale of one to ten, his pain is an eight for about four or five hours every day. (Id. at 54).

## IV. **Analysis**

### A. **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[2] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v.

---

[2] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

**B. Discussion**

An individual who applies for Social Security disability benefits must prove his or her disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for

determining if a claimant has proven his disability.[3]  20 C.F.R. §§ 404.1520, 416.920.

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since May 9, 2009, the alleged onset date, and that he has the severe impairments of a history of single vessel coronary disease, arthritis of the left hip, lumbar degenerative disc disease, and arthritis of the thoracic and cervical spine. (Tr. 23). The ALJ further found that Plaintiff does not have an impairment or

---

[3] The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform light work, with the following limitations: Plaintiff can stand and walk in combination for 3 to 3½ hours in an 8-hour workday.  Plaintiff can sit for up to 6 hours in an 8-hour workday with a sit/stand option every 30 to 45 minutes.  Plaintiff can lift and carry 5 to 10 pounds frequently and can occasionally lift and carry up to 20 pounds.  Plaintiff can occasionally bend, stoop, squat, and crouch.  Plaintiff cannot climb ladders, ropes, or scaffolds.  Plaintiff can rarely, i.e., no more than 20% of the workday, push or pull with his feet and legs.  Plaintiff cannot tolerate concentrated exposure, i.e., more than 20% of the workday, to respiratory irritants, such as fumes, chemicals, smoke, and solvents.  The claimant cannot tolerate exposure to extreme heat or cold.  (Id. at 24).  The ALJ also determined that while Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of the alleged symptoms were not credible to the extent that they were inconsistent with the RFC.  (Id. at 25).

Given Plaintiff's RFC, the ALJ found that Plaintiff is

incapable of performing his past work as an apartment maintenance man, truck driver, construction laborer, and material handler. (Id. at 29). However, utilizing the testimony of a VE, the ALJ concluded that considering Plaintiff's residual functional capacity for a range of light work, as well as his age, education and work experience, there are other jobs existing in the national economy that Plaintiff is able to perform, such as "office helper," "self storage rental clerk," and "ticket taker/seller," all of which are classified as light and unskilled. (Id. at 29-30). Thus, the ALJ concluded that Plaintiff is not disabled. (Id.).

Also pertinent to this appeal are the findings made by the ALJ in reaching his decision that Plaintiff is not disabled. In assessing Plaintiff's RFC, the ALJ made the following relevant findings:

> In terms of the claimant's alleged heart condition, the claimant was admitted to the hospital in March 2007 after complaining of chest tightness and shortness of breath (Exhibit 1F). The claimant was treated with aspirin, beta blockers, nitroglycerin, heparin, glycoprotein 2b3a inhibitors. The claimant continued to have occasional chest pain while in the hospital but overall remained chest pain free with acceptable hemodynamics. The claimant was subsequently transferred to a different hospital, where he underwent a cardiac catheterization (Exhibits 1F, 2F). The cardiac catheterization showed severe single vessel coronary artery disease, normal left systolic function, no aortic stenosis, and

no significant mitral regurgitation (Exhibit 2F). An EKG showed changes consistent with non-ST elevation myocardial infarction. A stent was placed in the mid right coronary artery with no complications. The claimant was discharged in stable condition on Plavix, Lisinopril, Atenolol, Pravastarin, and aspirin. The claimant was instructed to avoid heavy exertion for two weeks and to remain off work for two weeks. Chest x-rays taken in February 2008 showed a stable, negative chest (Exhibit 4F). Subsequent chest x-rays taken in May 2009 showed no important changes in the appearance of the claimant's chest since the February 2008 x-rays (Exhibit 4F). X-rays of the claimant's chest taken in April 2010 showed no acute abnormalities (Exhibit 9F).

Dr. Rihner, *a cardiologist*, examined the claimant on a consultative basis in August 2011 (Exhibit 16F). The claimant denied any major angina spells, but did complain of some *atypical* sharp chest pain, which Dr. Rihner did not even believe to be cardiac in nature. The claimant also alleged experiencing some mild dyspnea with exertion. Upon examination, Dr. Rihner observed a regular rate and rhythm with an apical S4. There were no murmurs or rubs. An EKG showed re-polarization changes and nonspecific ST-T wave changes inferiorly. The claimant's lungs were clear to auscultation and normal to percussion. Examination of the claimant's musculoskeletal system showed a normal back, gait, strength, and tone. Dr. Rihner noted that the claimant was in no acute distress. Dr. Rihner's impression is history of single vessel coronary disease treated with a stent and a documented normal ejection fraction. Based on the claimant's symptoms and the information available, Dr. Rihner "did not feel that [the claimant] is significantly disabled from a cardiovascular standpoint."

In terms of the claimant's alleged

musculoskeletal impairments, the claimant has a history of lower extremity pain, dating back to at least 2007 (Exhibit 1F). A CT scan of the claimant's chest taken in March 2007 showed degenerative changes of the spine (Exhibit 1F). The claimant sought treatment from Drs. Cockrell and Bose at the Orthopedic Group beginning in July 2008 (Exhibit 6F). X-rays of the claimant's hip taken in July 2008 showed *questionable early spurring* around the acetabulum bilaterally. X-rays of the claimant's lumbar spine taken in July 2008 showed some degenerative changes in the lower lumbar spine. The claimant was initially prescribed Mobic and Lortab for pain management and referred for an MRI. An MRI performed in July 2008 showed neuroforaminal narrowing at L5-S1 bilaterally. Dr. Cockrell recommended a lumbar epidural block, which the claimant received in August 2008. The epidural helped but the claimant continued to complain of left hip pain. Dr. Cockrell referred the claimant to Dr. Bose for further evaluation. Dr. Bose diagnosed the claimant in October 2008 with osteoarthritis of the left hip and injected his left hip. Dr. Bose injected the claimant's left hip again in March 2009 and in June 2009.

Dr. Crotwell, an orthopedic specialist, evaluated the claimant on a consultative basis in May 2011 (Exhibit 15F). The claimant reported back and bilateral hip pain with radicular pain down the left thigh to the calf. The claimant reported increased pain in the groin with rotation, walking, and standing after any long period of time. Upon examination, the claimant was able to flex, bend over, twist, *and get into contorted positions* to demonstrate where the pain was in his left leg and down his left thigh. The claimant put his hand all the way down his calf in flexion past 90 degrees with no pain. The claimant was able to toe and heel walk. The claimant's reflexes and sensory were normal. Motor was 5/5. Straight

leg raise sitting was 90 degrees right and left with no pain. The claimant's hip rotation was extremely limited, with the right at 80 percent of internal and external rotation and the left at 50 percent or less of internal and external rotation and limited abduction. Straight leg raise lying right 80 degrees, left 70 degrees, with increased pain with plantar flexion and decreased with dorsiflexion. The claimant exhibited no real radicular pain, mainly back pain, which Dr. Crotwell noted was "*very inconsistent.*" The claimant's left calf and thigh were slightly smaller than the right. Examination of the upper extremities showed normal reflexes and sensory, motor 5/5, normal grip strength, normal intrinsics and normal thenars. X-rays of the claimant's pelvis showed *moderate arthritis* of the left hip with spurs and some joint space collapse. X-rays of the cervical spine showed *mild* osteoarthritis. X-rays of the claimant's thoracic spine showed *mild to moderate* arthritis with *moderate* spurring. X-rays of the lumbar spine showed *moderate* arthritis with some disc space collapse, especially at L5-S1 with some spurring present. Dr. Crotwell's diagnostic impression was of moderate to severe arthritis of the left hip with limited motion, moderate lumbar degenerative disc disease, mild to moderate arthritis of the thoracic spine, and mild arthritis of the cervical spine. Dr. Crotwell noted that the claimant has some problems, particularly in the left hip, which may eventually need a joint replacement, but that he could carry out medium to light work, could definitely carry out light and sedentary work and could definitely work an eight-hour workday.

As for the claimant's subjective complaints of chest pain and shortness of breath, the claimant's allegations are not fully credible. The record documents only occasional complaints of chest pain and shortness of breath. The claimant has not

had any heart attacks or sought regular treatment from a cardiologist since 2007. Although the claimant sought follow up treatment from a cardiologist on one occasion in May 2010, he failed to show for his next appointment in November 2010 (Exhibit 11F). Dr. Rihner's examination findings were essentially benign. Additionally, the claimant has a long history of tobacco abuse; and has failed to follow up on repeated recommendations from his treating physicians to quit smoking (Exhibits 1F, 2F, 3F, 7F, 11F, 13F, 17F). Consequently, the undersigned finds that the claimant can clearly still perform a reduced range of light work. The postural and environmental limitations also fully accommodate the claimant's heart condition, in addition to the potentiality of *occasional* chest pain, shortness of breath, and/or any medication side effects.

As for the claimant's subjective complaints of hip, leg, and back pain, the claimant's allegations are also not fully credible. The claimant has a history of conservative treatment, consisting primarily of routine physical examinations with his primary care physician, Dr. Dulanto, at the Franklin Primary Health Center, and medication refills. Although Dr. Dulanto referred the claimant to an orthopedic specialist, there is no evidence in the record that the claimant sought treatment from an orthopedic specialist since he last saw Dr. Bose for a hip injection in June 2009 *and was denied additional narcotic pain medication in July 2009* (Exhibit 6F). Treatment notes show that the claimant *had a good response* to the hip injections (Exhibit 6F). Moreover, Dr. Bose described the claimant's hip arthritis as only *mild* in severity (Exhibit 6F). The claimant told Dr. Dulanto that his previous orthopedic surgeon recommended a hip replacement; however, there is no evidence in the record that Dr. Bose, Dr. Cockrell, or any other orthopedic specialist actually

recommended such surgery on the claimant's hip. Moreover, while Dr. Dulanto noted that the claimant's osteoarthritis was severe and disabling (Exhibit 13F), he simply prescribed pain medication. There is no evidence in the record that the claimant was referred to a pain management specialist or even physical therapy. There is also no evidence in the record of any treatment from Dr. Dulanto or any other physician at the Franklin Primary Health Center since November 2010. Dr. Dulanto's most recent treatment notes also document essentially normal musculoskeletal and back exams (Exhibit 13F). At that time, Dr. Dulanto recommended follow up treatment in two months, which suggests that the claimant's symptoms were adequately controlled and not so severe as to warrant more frequent treatment. Similarly, treatment notes dated October 2010 show a full range of motion. Additionally, although the claimant testified that he can only walk one block, the claimant told Dr. Crotwell in May 2011 that he could walk approximately half a mile (Exhibit 15F). Dr. Crotwell did not note any gait abnormalities. Dr. Rihner also noted that the claimant walked with a normal gait (Exhibit 16F). Hospital treatment notes from September 2011 likewise show a normal gait and normal strength throughout (Exhibit 17F). Although the claimant did present to the emergency room on two separate occasions in September 2011 complaining of hip and back pain, hospital treatment notes indicate that the claimant was actually *malingering and engaging in drug seeking behavior* (Exhibit 17F). After the emergency room physician refused to prescribe narcotic pain medication, the claimant left the hospital before the nurse could even give him an alternative prescription for steroids and his discharge paperwork.

Finally, the undersigned finds the claimant's allegation that he is unable to afford medical treatment or medication not

fully credible in light of the fact that the claimant continues to smoke. The undersigned nonetheless acknowledges the claimant's pain and other symptoms could still be reasonably expected to cause him some functional limitations and, accordingly, has precluded him from working at the medium to heavy exertional levels of his prior work and has instead limited the claimant to a reduced range of light work with a sit/stand option. The undersigned has also precluded the claimant from climbing ladders, ropes, and scaffolds and has limited the claimant to only rarely pushing and pulling with his feet and legs and occasionally bending, stooping, squatting, and crouching. The undersigned finds no support in the record for the additional functional limitations proposed by the claimant's representative at the hearing, especially when Dr. Dulanto's proposed functional limitations are rejected in favor of the more complete and highly credentialed opinions of Drs. Rihner and Crotwell.

As for the opinion evidence, the undersigned gives significant weight to the opinion of Dr. Rihner (Exhibit 16F), other than his limitations regarding the claimant's use of his hands and some environmental limitations, which are not supported by Dr. Rihner's own examination findings or the record as a whole. The record does not substantiate the presence of limitations on the claimant's use of his hands or any significant ongoing cardiac problems which would limit his ability to work at unprotected heights, around moving mechanical parts, or operate a motor vehicle. For example, the claimant specifically acknowledged in May 2011 that he drives unrestricted (Exhibit 15F). The undersigned proffered the report and opinion of Dr. Rihner to the claimant's representative (Exhibit 13E). The claimant's representative did not respond to the proffer, even though he did respond at

length to Dr. Crotwell's earlier consultative report.

The undersigned also gives significant weight to the opinion of Dr. Crotwell to the extent is consistent with the above residual functional capacity (Exhibit 15F). The claimant's representative objected to the report and findings of Dr. Crotwell (Exhibit 12E) on the basis that Dr. Crotwell's report is marked "preliminary." The report makes clear, however, that Dr. Crotwell initially dictated his report. By signing the report, Dr. Crotwell indicated that he approved the report as final. The claimant's representative also objected to Dr. Crotwell's PCE finding that the claimant can sit, stand, and walk for two hours at a time each and can also perform each of these activities for a total of 8 hours during an 8-hour workday. While Dr. Crotwell noted that the claimant has "some problems," he nonetheless specifically found that the claimant could work an 8-hour day in moderate to light and sedentary work as set forth on the PCE. In any event, the limitations set forth in the undersigned's residual functional capacity finding above are actually more restrictive than Dr. Crotwell's opinion. . . .

The undersigned gives no weight to the opinion of Dr. Dulanto, the claimant's treating physician (Exhibit 8F). Dr. Dulanto completed a Clinical Assessment of Pain form in June 2010. He opined that the claimant's pain is *intractable and virtually incapacitating*, that physical activity will increase the claimant's pain to such an extent that bed rest will be necessary, and the claimant will be totally restricted and unable to function at a productive level of work. Dr. Dulanto's opinion is inconsistent with his own treatment notes, which show some reduced range of motion, but clearly nothing objectively disabling. Dr. Dulanto's most recent treatment notes even show normal

musculoskeletal and back exams (Exhibit 13F). Moreover, Dr. Dulanto noted that the claimant has been at this level for "years;" however, the claimant worked successfully for many years, until May 2009, despite his alleged pain. Dr. Dulanto also noted that the claimant cannot walk outside. Just two months later, however, the claimant was treated at the emergency room after becoming overheated while working outside (Exhibit 12F). The hospital treatment notes show normal musculoskeletal and extremity exams, with full range of motion (Exhibit 12F). Although Dr. Dulanto does have a treating relationship with the claimant, the record shows that actual treatment visits have been relatively infrequent. Finally, Dr. Dulanto is a family practice physician, not an orthopedic surgeon or pain management specialist, and thus his opinion appears to rest in large part on an assessment of an impairment outside of his area of medical expertise. Instead, his opinion appears far more reliant on claimant's own rather dubious subjective complaints.

In sum, the above residual functional capacity assessment is supported by a preponderance of the most credible evidence of record, including the examination findings and opinions of Drs. Rihner and Crotwell, the claimant's history of conservative and sporadic treatment, and physician and hospital treatment notes.

(Tr. at 25-29) (emphasis in original). The Court now considers the foregoing in light of the record in this case and the issue on appeal.

1. **Issue**

    **Whether the ALJ erred in not giving controlling weight to the opinions of Plaintiff's treating physician?**

Plaintiff argues that the ALJ erred in not giving controlling weight to the opinions of his treating physician, Dr. Felix Dulanto, that Plaintiff's pain is intractable and virtually incapacitating and prevents him from being able to work.[4] (Doc. 12 at 2, 4). The Commissioner counters that the ALJ properly discounted Dr. Dulanto's opinions because they are inconsistent with the record evidence in this case. (Doc. 15 at 10-14). Having carefully reviewed the record in this case, the Court agrees with Defendant that Plaintiff's claim is without merit.

Generally speaking, "[i]f a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight."[5] Roth v. Astrue, 249 F. Appx. 167, 168 (11th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)).

"An administrative law judge must accord substantial or considerable weight to the opinion of a claimant's treating

---

[4] The record shows that the ALJ gave "no weight" to the opinions of Dr. Dulanto set forth in the June 17, 2010, Clinical Assessment of Pain form. (Tr. 28).

[5] "Controlling weight" is defined as a medical opinion from a treating source that must be adopted. See SSR 96-2P, 1996 SSR LEXIS 9, *3, 1996 WL 374188, *1 (1996).

physician unless good cause is shown to the contrary." Broughton v. Heckler, 776 F.2d 960, 961 (11th Cir. 1985)(citations and internal quotation marks omitted). "The requisite 'good cause' for discounting a treating physician's opinion may exist where the opinion is not supported by the evidence, or where the evidence supports a contrary finding." Hogan v. Astrue, 2012 U.S. Dist. LEXIS 108512, *8, 2012 WL 3155570, *3 (M.D. Ala. 2012). "Good cause may also exist where a doctor's opinions are merely conclusory, inconsistent with the doctor's medical records, or unsupported by objective medical evidence." Id. "[T]he weight afforded a treating doctor's opinion must be specified along with 'any reason for giving it no weight, and failure to do so is reversible error.'" Williams v. Astrue, 2009 U.S. Dist. LEXIS 12010, *4, 2009 WL 413541, *1 (M.D. Fla. 2009); see also Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004) ("When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate [his or her] reasons.").

The record in this case shows that, after treating Plaintiff for six months, Dr. Dulanto completed a Clinical Assessment of Pain form dated June 17, 2010, in which he stated that Plaintiff's pain is caused by degenerative disc disease of the spine and severe osteoarthritis of the left hip; that Plaintiff's pain is "intractable and virtually incapacitating;"

that physical activity will increase Plaintiff's pain to such an extent that bed rest will be necessary; that Plaintiff's pain will impact his ability to perform his past work; and that Plaintiff will be totally restricted and unable to function at a productive work level. (Tr. 295-96). Dr. Dulanto further found that Plaintiff "can't walk outside his house" and has been at his present level of pain for "years." (Id. at 296). Dr. Dulanto opined that Plaintiff needs a hip replacement, which, he stated, Plaintiff cannot afford. (Id. at 296). Dr. Dulanto concluded that Plaintiff cannot engage in any form of gainful employment over an eight-hour day, noting that Plaintiff also has coronary artery disease. (Id.).

Plaintiff argues that the ALJ should have afforded Dr. Dulanto's opinions controlling weight and that he erred in failing to do so. (Doc. 12 at 1). Having reviewed the record at length, the Court finds that Dr. Dulanto's opinions are not supported by the record.

First, with respect to Plaintiff's left hip impairment, Dr. Dulanto's opinions are inconsistent with the opinions of Plaintiff's treating orthopedists, Dr. J.M. Cockrell and Dr. W.J. Bose. As the ALJ articulated, in July, 2008, Dr. Cockrell found that Plaintiff had good range of motion in his hip with minimal pain. (Id. at 290). X-rays of Plaintiff's hip taken at that time confirmed that Plaintiff had nothing more than

"questionable early spurring around the acetabulum bilaterally."
(Id.).  When Plaintiff continued to complain of left hip pain in
2008 and 2009, Dr. Bose diagnosed him with "osteoarthritis, left
hip" and ordered a series of injections in his hip, which
provided "great benefit." [6]  (Id. at 285-88).  The treatment
records of Drs. Cockrell and Bose, which reflect significant
improvement in Plaintiff's pain symptoms after receiving
conservative injection therapy, undermine Dr. Dulanto's opinions
that Plaintiff's pain is intractable and incapacitating.[7]

In addition, as the ALJ articulated, Dr. Dulanto's opinions
in the June 2010 Clinical Assessment of Pain form are
inconsistent with the May 2011 examination findings of
consultative orthopedist, Dr. William Crotwell, which showed
that Plaintiff's reflexes and sensory were normal, that he was
able to flex, bend over, twist, and get into contorted positions
to demonstrate the location of his pain, and that his toe and
heel walk were normal.  (Id. at 342-43).  Although Dr. Crotwell
opined that Plaintiff has moderate to severe arthritis of the

---

[6] Plaintiff also complained of generalized back and leg pain, and
x-rays confirmed "moderate to marked narrowing of the neural
foramen narrowing at L5-S1." (Tr. 289).  However, the record
shows that an epidural block in August 2008 improved those
symptoms. (Id. at 288).

[7] There is no evidence in the record that any of Plaintiff's
treating physicians referred him to a pain management specialist
or even for physical therapy.

left hip and may eventually need a hip joint replacement, he unequivocally concluded that Plaintiff could carry out light and sedentary work and work an eight-hour workday. (Id. at 344).

Moreover, Dr. Dulanto's comment that Plaintiff "can't walk outside his house" is inconsistent with Plaintiff's subsequent report to Dr. Crotwell during the consultative examination that he can walk approximately half a mile (id. at 342), as well as the treatment records from Providence Hospital in August 2010 which show that Plaintiff was treated in the emergency room after "overheat[ing]" while "working outside" (id. at 322), and the finding of consultative cardiologist, Dr. Rihner, in August 2011 that Plaintiff has a "normal . . . gait."[8] (Id. at 348). All of the foregoing evidence belies Dr. Dulanto's opinion that Plaintiff's pain is incapacitating.

Similarly, to the extent that Dr. Dulanto based his opinions on Plaintiff's impairment of coronary artery disease, those opinions are inconsistent with the record evidence in this case, including the examination findings and opinion of

_____

[8] Emergency room records dated September 4, 2011, also show that Plaintiff presented with complaints of sciatica, and the emergency room physician noted that Plaintiff walked with a "normal gait." (Tr. 366). Plaintiff was treated with steroids and pain medication and discharged with Lortab and instructions to see his primary care physician. (Id. at 367). Four days later, Plaintiff returned to the emergency room but refused treatment with steroids and left without further treatment after being denied further narcotic pain medication. (Id. at 377).

consultative cardiologist Dr. Rihner that Plaintiff is simply not "significantly disabled from a cardiovascular standpoint." (Id. at 349). Although it is undisputed that Plaintiff was diagnosed in 2007 with severe single vessel coronary artery disease and underwent a coronary angioplasty at that time, the record shows that the surgery was performed without complications, that Plaintiff recovered, and that Plaintiff returned to work in two weeks. (Id. at 237, 240, 245). The following year, in January 2008, Dr. Raymond Broughton noted that Plaintiff was working, climbing several flights of stairs each day, and having no chest pain or shortness of breath. (Id. at 250). Over the following three years, Plaintiff's chest x-rays showed a stable, non-enlarged heart, with no acute abnormalities. (Id. at 262, 268, 273, 309). In August 2011, Dr. Rihner confirmed that Plaintiff had not had any subsequent evaluation for his heart since receiving a stent in 2007, and his findings upon examination were essential normal.[9] (Id. at 348). This evidence is inconsistent with any opinion by Dr. Dulanto that Plaintiff's pain is incapacitating, in whole or in

_____

[9] Dr. Dulanto's opinions are also inconsistent with Dr. Rihner's findings set forth in a Medical Source Statement dated August 17, 2011, that Plaintiff can frequently lift/carry 21 to 50 pounds, can occasionally lift/carry up to 100 pounds, can sit for four hours at a time for a total of eight hours a day, can stand for one hour at a time for a total of two hours a day, and can walk for thirty minutes at time for a total of one hour a day. (Tr. 349).

part, as a result of his cardiovascular disease.

For each of these reasons, the Court finds that Dr. Dulanto's opinions set forth in the June 2010 Clinical Assessment of Pain form are inconsistent with the record evidence. Therefore, the ALJ did not err in failing to give controlling weight to those opinions, and Plaintiff's claim is without merit.

### V. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability, disability insurance benefits, and supplemental security income be **AFFIRMED.**

**DONE** this **23rd** day of **September, 2014.**

/s/ SONJA F. BIVINS
UNITED STATES MAGISTRATE JUDGE